United States District Court
Southern District of Texas
**ENTERED**
August 10, 2021
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOE and KATHLEEN MANCUSO, | § § | CIVIL ACTION NO. 4:18-cv-03380 |
| Plaintiffs, | § § § | |
| vs. | § | JUDGE CHARLES ESKRIDGE |
| | § § | |
| OCWEN LOAN SERVICING, LLC, | § § | |
| Defendant. | § | |

OPINION AND ORDER
GRANTING MOTION FOR SUMMARY JUDGMENT

The motion for summary judgment by Defendant Ocwen Loan Servicing, LLC is granted. Dkt 11.

1. Background

The record developed by Plaintiffs Joe and Kathleen Mancuso isn't terribly robust. That's part of their problem in resisting summary judgment. The following is drawn as favorably as possible to the Mancusos from their state court complaint (as to matters that are apparently undisputed), their depositions, and certain documents as to their contract and communications with Ocwen and others.

Mr Mancuso purchased a home in Houston, Texas in June 2001. Dkt 11-1 at 5 (Mr Mancuso deposition). He also executed a promissory note for $100,000 made payable to Megamerica Mortgage Group, Inc, and both he and his wife Kathleen executed a deed of trust in its favor to secure the payment of the note. Id at 50–51. Mr Mancuso then began making monthly mortgage payments. He claims that those payments went towards the principal and interest on the promissory note, property taxes, property insurance, and flood

insurance. Dkt 1-2 at 6. But nothing in the record demonstrates that contention.

GMAC Mortgage, LLC serviced the loan by collecting these monthly payments. Dkt 11-1 at 6, 66. It allegedly used a portion of those payments to pay the annual flood-insurance premium to United Services Automobile Association, which insured the property in that regard. Dkt 1-2 at 6–7; Dkt 13-1 at 1 (Mr Mancuso affidavit); Dkt 13-2 at 1 (Mrs Mancuso affidavit). Mr Mancuso later refinanced his initial loan by executing a Texas "home equity security instrument" in November 2005, which secured a $128,500 home equity loan. Dkt 11 at 7–8; see Dkt 11-1 at 98–118 (security instrument). United States Bank was the owner of that refinanced loan and the beneficiary of the security instrument. Dkt 11 at 17 n 27.

GMAC apparently continued servicing the loan after it was refinanced, but it later transferred its duties in that regard to Ocwen in February 2013. Dkt 11-1 at 6, 66–67 (notice of servicing transfer). The Mancusos then began making mortgage payments to Ocwen the next month. Dkt 1-2 at 7; Dkt 13-1 at 2; Dkt 13-2 at 2. Ocwen sent them a mortgage account statement on July 1, 2013, which showed that it made a flood insurance payment on June 21, 2013. Dkt 13-1 at 4–5.

USAA sent a letter to the Mancusos on July 7, 2014, stating that their flood insurance policy had lapsed the day before due to lack of payment. They then paid the flood insurance premium directly to USAA on July 16, 2014, and USAA reinstated the policy from July 6, 2014 until July 6, 2015. Dkt 13-1 at 3; Dkt 13-2 at 2. Shortly thereafter, Ocwen sent a letter to the Mancusos in October 2014, stating that the flood insurance policy had expired and that Ocwen would obtain flood insurance on his behalf if they didn't provide proof of insurance. Dkt 13-1 at 6–10; Dkt 13-2 at 6–10. But the Mancusos told Ocwen that they had already paid the flood insurance premium directly in July 2014. Dkt 13-1 at 3; Dkt 13-2 at 2; Dkt 1-2 at 8.

Some time passed. Ocwen then provided the Mancusos with an escrow analysis in February 2017, which confirmed that it wouldn't escrow funds from them to pay for flood insurance. Dkt 11-1 at 87–92; see also Dkt 11 at 9. Ocwen then refunded an

escrow surplus of $2,140.26 to the Mancusos on February 15, 2017. Dkt 11-1 at 16–17 (Mr Mancuso deposition); see also id at 69–70 (monthly statement reflecting refund).

Mrs Mancuso claims that she and her husband thereafter received "a notice stating that flood insurance was due" in June 2017. Dkt 11-1 at 124–25 (Mrs Mancuso deposition). Ocwen did send such a notice to the Mancusos in October 2014. See Dkt 13-1 at 6–10. But no such notice from June 2017 is in evidence. Regardless, Mrs Mancuso says that she called Ocwen at some point during or after June 2017 "to inquire why they did not have flood insurance coverage since they had been making escrow payments." Dkt 13 at 4. She claims to have spoken with "an Ocwen representative named Ashley," who told her "that 'we'll pay it. It's in and we'll take care of it.'" Ibid. Less than two months later, the Mancusos made their final mortgage payment on August 3, 2017. Dkt 11 at 9; Dkt 13-1 at 3; Dkt 13-2 at 3. And Ocwen refunded the remaining positive escrow balance to the Mancusos on August 17th, while releasing the lien shortly thereafter. Dkt 11-1 at 14, 17, 144–45.

Tropical Storm Harvey then descended on the Houston area three weeks later, filling the Mancusos' home with several feet of water on August 26th and forcing them to evacuate. They state that most of their personal property was damaged and that the house sustained "major damage," which required them "to remove carpet, rugs, sheetrock, cabinets, furniture, appliances, clothing and other property which had been totally destroyed by the flood water." Dkt 13-1 at 3; Dkt 13-2 at 3.

Mr Mancuso called USAA, which informed him that he didn't have flood insurance in place. Dkt 11-1 at 18 (Mr Mancuso deposition). USAA also told him that the last time he had flood insurance was in 2015—when he made the payment himself. Id at 20. In other words, no one (including Ocwen) had paid any flood insurance premium for the property since July 2014. Ibid.

The Mancusos brought action against Ocwen in Texas state court in August 2018. They assert claims for violations of the Texas Deceptive Trade Practices Act, breach of contract, and negligent misrepresentation. Dkt 1-2 at 5–11. Ocwen removed the action in September 2018 pursuant to 28 USC §§ 1332 and

3

1441. Dkt 1. It eventually moved for summary judgment in October 2019. Dkt 11. The action was reassigned to this Court later that same month. Dkt 12.

The parties agreed in April 2020 to engage in mediation. Dkt 17. The matter was stayed with allowance of any reasonable amount of time necessary to mediate due to the COVID-19 pandemic. Minute Entry of 04/09/2020. The parties filed a status report in January 2021 indicating that mediation was unsuccessful. Dkt 19.

### 2. Legal standard

Rule 56(a) of the Federal Rules of Civil Procedure requires a court to enter summary judgment when the movant establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is *material* if it "might affect the outcome of the suit under the governing law." *Sulzer Carbomedics, Inc v Oregon Cardio-Devices, Inc*, 257 F3d 449, 456 (5th Cir 2001), quoting *Anderson v Liberty Lobby, Inc*, 477 US 242, 248 (1986). And a dispute is *genuine* if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Royal v CCC & R Tres Arboles, LLC*, 736 F3d 396, 400 (5th Cir 2013), quoting *Anderson*, 477 US at 248.

The summary judgment stage doesn't involve weighing the evidence or determining the truth of the matter. The task is solely to determine whether a genuine issue exists that would allow a reasonable jury to return a verdict for the nonmoving party. *Smith v Harris County*, 956 F3d 311, 316 (5th Cir 2010), quoting *Anderson*, 477 US at 248. Disputed factual issues must be resolved in favor of the nonmoving party. *Little v Liquid Air Corp*, 37 F3d 1069, 1075 (5th Cir 1994). All reasonable inferences must also be drawn in the light most favorable to the nonmoving party. *Connors v Graves*, 538 F3d 373, 376 (5th Cir 2008), citing *Ballard v Burton*, 444 F3d 391, 396 (5th Cir 2006).

The moving party typically bears the entire burden to demonstrate the absence of a genuine issue of material fact. *Nola Spice Designs LLC v Haydel Enterprises Inc*, 783 F3d 527, 536 (5th Cir 2015) (quotation omitted); see also *Celotex Corp v Catrett*, 477 US 317, 322–23 (1986) (citations omitted). But when a motion for summary judgment by a defendant presents a

question on which the plaintiff bears the burden of proof at trial, the burden shifts to the plaintiff to proffer summary judgment proof establishing an issue of material fact warranting trial. *Nola Spice*, 783 F3d at 536 (quotation omitted). To meet this burden of proof, the evidence must be both "competent and admissible at trial." *Bellard v Gautreaux*, 675 F3d 454, 460 (5th Cir 2012) (citation omitted).

3. Analysis

The Mancusos' claims for breach of contract, negligent misrepresentation, and violations of the Texas Deceptive Trade Practices Act are each addressed in turn.

a. Breach of contract claim

To succeed on their claim for breach of contract against Ocwen, the Mancusos must establish that a valid contract existed between them and Ocwen; they tendered performance; Ocwen breached the contract; and they suffered damages due to the breach. *Lewis v Bank of America NA*, 343 F3d 540, 544–45 (5th Cir 2003), citing *Palmer v Espey Huston & Associates, Inc*, 84 SW3d 345, 353 (Tex App—Corpus Christi 2002, pet denied). When the meaning of a contract is disputed, courts applying Texas law must "ascertain and give effect to the parties' intent as expressed in the instrument." *URI, Inc v Kleberg County*, 543 SW3d 755, 763 (Tex 2018). To achieve that objective, Texas courts "interpret contract language according to its 'plain, ordinary, and generally accepted meaning' unless the instrument directs otherwise." Id at 764, quoting *Heritage Resources, Inc v NationsBank*, 939 SW2d 118, 121 (Tex 1996). The Texas Supreme Court further holds, "An unambiguous contract will be enforced as written, and parol evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports." *Sacks v Haden*, 266 SW3d 447, 450–51 (Tex 2008).

Ocwen argues that it didn't breach the security instrument at issue. Dkt 11 at 11–12. It cites a provision of the security instrument that states, "If Borrower fails to maintain any of the coverages described above, Lender *may* obtain insurance coverage, at Lender's or Borrower's expense. *Lender is under no obligation to purchase any particular type or amount of coverage*." Dkt 11-1

5

at 103 (emphasis added). This means, says Ocwen, that it had no obligation to purchase flood insurance on behalf of the Mancusos—which further means that it can't have breached an obligation that didn't exist under the instrument. Dkt 11 at 11–12. Ocwen also argues that "any excess escrow was returned to the Plaintiffs" and that "the contractual relationship ended before the property damage," and so the breach of contract claim fails as a matter of law. Id at 12.

The Mancusos contend that they don't base their breach-of-contract claim on the security instrument. Dkt 13 at 5. It's instead based, they say, on a letter that Ocwen sent Mr Mancuso on October 16, 2014. Dkt 13 at 6–7; see Dkt 13-1 at 6–10. That letter in relevant part provides:

> Our records show that your flood insurance expired, and we do not have evidence that you have obtained new coverage. Because flood insurance is required on your property, we plan to buy insurance for your property. You must pay us for any period during which the insurance we buy is in effect but you do not have insurance.

Dkt 13-1 at 6. They also point to the escrow analysis that Ocwen mailed to them in February 2017, arguing that Ocwen didn't follow the procedures there before cancelling their escrow account. Dkt 13 at 7.

Any claim for breach of contract must of necessity be tied to the security instrument at issue because it alone governed the contractual relationship between the Mancusos and Ocwen. No evidence indicates that Ocwen breached any provision of that security instrument. The letter and escrow analysis to which the Mancusos now point simply aren't contracts, given that nothing establishes offer, acceptance, and consideration in that respect. And regardless, the October 2014 letter has no pertinence to events in an entirely different policy year.

Ocwen is thus entitled to summary judgment on the claim against it for breach of contract.

### b. Negligent misrepresentation claim

The economic-loss doctrine as applied under Texas law generally bars recovery in tort when a party's only injury is economic loss under a contract. *Southwestern Bell Telephone Co v DeLanney*, 809 SW2d 493, 494–95 (Tex 1991). Ocwen argues that this doctrine bars the Mancusos' claim for negligent misrepresentation. Dkt 11 at 13.

If parties are in contractual privity, "a plaintiff may not bring a claim for negligent misrepresentation unless the plaintiff can establish that he suffered an injury that is distinct, separate, and independent from the economic losses recoverable under a breach of contract claim." *Sterling Chemicals, Inc v Texaco Inc*, 259 SW3d 793, 796 (Tex App—Houston [1st Dist] 2007, pet denied, citing *DSA Inc v Hillsboro Independent School District*, 973 SW2d 662, 664 (Tex 1998); see also *Preston v Seterus Inc*, 931 F Supp 2d 743, 767 (ND Tex 2013) (holding economic-loss doctrine to bar negligent-misrepresentation claim in loan-servicing context). And the burden is on the plaintiff to prove that the alleged injury is independent of the economic loss recoverable under a breach-of-contract claim. See *Sterling Chemicals*, 259 SW3d at 797.

The Mancusos in no way meet their burden. They claim that Ocwen's alleged negligent misrepresentations "proximately caused damages" to them. Dkt 1-2 at 9. But they neither specify those damages nor explain how they are distinct from their breach-of-contract claim. Indeed, their response states nothing other than that this claim "goes beyond their contract claim." Dkt 13 at 7. That's insufficient.

Ocwen is entitled to summary judgment on the negligent-misrepresentation claim.

### c. Texas Deceptive Trade Practices Act claim

Ocwen moves for summary judgment on the DTPA claim brought against it. Dkt 11 at 16–17. The Mancusos concede that they weren't the purchasers of goods and services under the DTPA. Dkt 13 at 10.

Ocwen is entitled to summary judgment on the DTPA claim.

7

4. Conclusion

The motion by Defendant Ocwen Loan Servicing, LLC for summary judgment is GRANTED. Dkt 11.

The claims by Plaintiffs Joe and Kathleen Mancuso against Ocwen are DISMISSED WITH PREJUDICE.

This is a FINAL JUDGMENT.

SO ORDERED.

Signed on August 10, 2021, at Houston, Texas.

_____
Hon. Charles Eskridge
United States District Judge